# Third District Court of Appeal

## State of Florida

Opinion filed July 31, 2025.

_____

No. 3D25-1398
Lower Tribunal No. 25-12463-CA-01

_____

**City of Miami,**
Appellant,

vs.

**Emilio Tomas Gonzalez, et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Valerie R. Manno Schurr, Judge.

Kozyak Tropin & Throckmorton LLP, and Dwayne A. Robinson and Brandon Sadowsky; George K. Wysong III, City Attorney, and Eric J. Eves, Assistant City Attorney Supervisor, for appellant.

Lawson Huck Gonzalez, PLLC, and C. Alan Lawson (Tallahassee), Jason B. Gonzalez (Tallahassee), Paul Huck, Jr., Mathew D. Gutierrez, Anthony J. Sirven, Matthew Casbarro, and Brian M. Trujillo, for appellee Emilio Tomás González; Geraldine Bonzon-Keenan, Miami-Dade County Attorney, and Michael B. Valdes and Miguel A. Gonzalez, Assistant County Attorneys, for appellee Miami-Dade County.

Before EMAS, GORDO and LOBREE, JJ.

GORDO, J.

The City of Miami ("City") appeals a final judgment entered in favor of Emilio Tomas Gonzalez ("Gonzalez"), which denied its emergency motion to dismiss the complaint and granted Gonzalez's motion for summary judgment. We have jurisdiction. Fla. R. App. P. 9.030(b)(1)(A).

In this appeal, we are tasked with deciding whether the City's enactment of an ordinance ("Ordinance") changing its general municipal elections to even-numbered years—effectively canceling its upcoming November 2025 election and extending the terms of its elected officials beyond their established term limits—without submission to the voters for approval by referendum is constitutionally impermissible. We hold the trial court correctly found the Ordinance unconstitutional and affirm.

## I.

***Home Rule Amendment***

In 1956, the Florida Constitution of 1885 was amended to grant the electors of Miami-Dade County the power to control the nature and structure of their local government through the adoption of a home rule charter. Article VIII, section 11 of the 1885 Florida Constitution ("Home Rule Amendment")[1]

---

[1] The current version of the Florida Constitution preserves the Home Rule Amendment. See Art. VIII, § 6(e), Fla. Const.

provided: "[t]he electors of Dade County, Florida, are granted power to adopt, revise, and amend from time to time a home rule charter of government for Dade County, Florida, under which the Board of County Commissioners of Dade County shall be the governing body."  Art. VIII, § 11(1), Fla. Const. (1885).

The adoption of the Home Rule Amendment was prompted by the unique and growing needs of Miami-Dade County, which, by the mid-twentieth century, had become the most populous county in Florida and was home to the State's largest city.  As the Florida Supreme Court observed in Gray v. Golden, 89 So. 2d 785 (Fla. 1956), Miami-Dade County's complexity justified a more flexible and locally responsive form of government.  The Court recognized: "[t]hat Dade is the most populous county in the state; that Miami in said county is the largest city in the state; that there are twenty-six municipalities in Dade County; that said county is a great railroad, manufacturing and commercial center; that it has one of the great harbors of the nation; that the airborne freight and passenger traffic originating in and passing through Dade County is national and international in scope, and that said factors constitute Dade County one of the great metropolitan areas of the world."  Gray, 89 So. 2d at 786.

The Home Rule Amendment was an elegant negotiation between the voters of the State of Florida and the people of Miami-Dade County, in which the State, through its Constitution, granted the County Home Rule authority in certain limited and expressly enumerated provisions dealing with local affairs and preserved its power to legislate in all matters of state interest as expressed in the Constitution and the general law. Indeed, the purpose of this Amendment "was not only to provide local self-government to the people of Dade County with the board of county commissioners as the governing body, but to preserve the supremacy of the legislature in all matters of state interest as expressed in the Constitution and the general law." Gray, 89 So. 2d at 788.

As the Florida Supreme Court continues to recognize, "the metropolitan government of Dade County is unique in this state due to its constitutional home rule amendment." Metro. Dade Cnty. v. City of Miami, 396 So. 2d 144, 146 (Fla. 1980). The Home Rule Amendment "gives Dade County numerous powers which set Dade apart from the state's other counties." Id. "One such difference is Dade County's power to enact ordinances, when expressly authorized by the home rule amendment, **which conflict with the state constitution or with state law.**" Id. (citing Art. VIII, § 11(5), Fla. Const. (1885)) (emphasis added).

4

Subsection (1) of the Home Rule Amendment includes ten specific grants of authority. As to these ten matters, the Florida Supreme Court has expressly held the Miami-Dade County Home Rule Charter governs over general law, and "[i]n all other matters the Constitution and general laws control." Gray, 89 So. 2d at 791. Relevant to this appeal, Article VIII, section 11(1)(g) provides Miami-Dade County the unique ability to regulate the formation and amendment of municipal charters.

**Miami-Dade County Home Rule Charter**

Acting under the above constitutional grant of authority, on May 21, 1957, the electors of Miami-Dade County adopted the Miami-Dade County Home Rule Charter ("County Home Rule Charter"), becoming the first charter county in Florida to exercise Home Rule powers. Consistent with the Florida Constitution's provision empowering it to adopt a "method by which each municipal corporation in Dade County shall have the power to make, amend or repeal its own charter," Miami-Dade County prescribed such a framework by enacting Article VI, section 6.03(A) of its Home Rule Charter.[2] Art. VIII, § 11(1)(g), Fla. Const. (1885). Article VI, section 6.03(A) requires any municipal charter amendment to be submitted to the electorate for approval:

---

[2] Article VI, section 6.03, included in the original 1957 County Home Rule Charter, has never been amended.

5

> Except as provided in Section 6.04 [for changes to municipal boundaries], any municipality in the county may adopt, amend, or revoke a charter for its own government or abolish its existence in the following manner. Its governing body shall, within 120 days after adopting a resolution or after the certification of a petition of ten percent of the qualified electors of the municipality, draft or have drafted by a method determined by municipal ordinance **a proposed charter amendment, revocation, or abolition which shall be submitted to the electors of the municipalities.** Unless an election occurs not less than 60 nor more than 120 days after the draft is submitted, the proposal shall be submitted at a special election within that time. The governing body shall make copies of the proposal available to the electors not less than 30 days before the election. Alternative proposals may be submitted. **Each proposal approved by a majority of the electors voting on such proposal shall become effective at the time fixed in the proposal.**

Art. VI, § 6.03(A), Miami-Dade County Home Rule Charter (emphasis added).

As provided by the Florida Constitution, the amendment of a municipal charter by referendum is the "exclusive" method for doing so. Art. VIII, § 11(1)(g), Fla. Const. (1885).

***City of Miami Charter***

On September 4, 1984, the City—a municipal corporation within Miami-Dade County—adopted its current version of the City of Miami Charter

6

("City Charter").[3]  The City Charter sets forth specific election dates and term lengths for the mayor and city commissioners.  Section 7 specifies that "[a] general municipal election for the mayor and city commissioners shall be held on the first Tuesday after the first Monday in November in odd-numbered years."  § 7, City of Miami Charter.  Section 4(b) sets a four-year term for the mayor and all commissioners and establishes a term limit of two consecutive full terms.  See § 4(b), City of Miami Charter.

***Passing of the Ordinance***

On June 26, 2025, the City Commission passed the Ordinance by a three to two vote and the mayor subsequently signed it into law.  The Ordinance moved the date of the City's general municipal election, scheduled for November 4, 2025, to align with the national and gubernatorial election on November 3, 2026, and, in the process, extended the terms of a sitting commissioner and the incumbent mayor beyond their term limits.[4]  It also moved the date of all subsequent elections to even-numbered years.

---

[3]  The City Charter was first adopted on May 17, 1921.

[4]  On June 5, 2025, prior to the passing of the Ordinance, one commissioner sought the Florida Attorney General's opinion on whether such an act would be constitutional without the approval of the City's electors.  On June 11, 2025, the Attorney General issued an opinion that any amendment to the City Charter—either to move the date of municipal elections or to change the terms of office for elected officials—must be submitted to the voters as required by the County Home Rule Charter and the Florida Constitution.  See Op. Att'y Gen. Fla. 2025-01 (2025).

On June 30, 2025, Gonzalez, a putative mayoral candidate, filed a complaint seeking a declaration that the Ordinance is unconstitutional as violative of Article VI, section 6.03(A) of the County Home Rule Charter, which requires any amendment to the City Charter to be made by referendum.[5] Gonzalez argued the Ordinance effectively amended the existing sections of the City Charter, which establishes elections in odd-numbered years and limits elected officials to being elected to two four-year terms. In response, the City filed an emergency motion to dismiss the complaint, arguing the Ordinance is authorized collectively under three general law statutes—specifically, sections 100.3605, 166.021 and 101.75 of the Florida Statutes—which the City contends supersede the County Home Rule Charter. Gonzalez moved for summary judgment.

Following a hearing, the trial court denied the City's emergency motion to dismiss and granted Gonzalez's motion for summary judgment. The trial court then entered final judgment in favor of Gonzalez, finding the Ordinance constitutes an impermissible amendment to the City Charter without a vote of the electorate, as required by Article VI, section 6.03(A) of the County Home Rule Charter and Article VIII, section 11(1)(g) of the 1885 Florida

---

[5] The complaint also sought an injunction against enforcement of the Ordinance. That count was voluntarily dismissed, leaving only the count for declaratory relief.

Constitution, now contained in Article VIII, section 6(e) of the Florida Constitution. This appeal followed.

## II.

"The standard of review on orders granting final summary judgment is de novo." Ibarra v. Ross Dress for Less, Inc., 350 So. 3d 465, 467 (Fla. 3d DCA 2022) (quoting Orozco v. McCormick 105, LLC, 276 So. 3d 932, 935 (Fla. 3d DCA 2019)). "A trial court's ruling on a motion to dismiss for failure to state a cause of action is an issue of law, and therefore, our standard of review is *de novo*." Lam v. Univision Commc'ns, Inc., 329 So. 3d 190, 197 (Fla. 3d DCA 2021) (quoting Schilling v. Herrera, 952 So. 2d 1231, 1234 (Fla. 3d DCA 2007)). "We review de novo questions of constitutional interpretation." Telli v. Broward Cnty., 94 So. 3d 504, 505 n.1 (Fla. 2012).

## III.

The City challenges the trial court's declaration that the Ordinance is unconstitutional and asks us to find that its application of the general law statutes is permissible and supersedes its own Charter and the County Home Rule Charter.

Specifically, the City argues the use of an ordinance to effectuate the change to its election dates is neither an attempt by the term-limited mayor and commissioner to improperly extend their power nor an attempt to

9

circumvent the will of the voters. Instead, it is a cost-savings measure because consolidating its general municipal elections with statewide and countywide elections will save voters a substantial sum of money and generate a larger voter turnout.[6]

Gonzalez counters the three state statutes relied upon by the City are permissive and must give way to the expressly enumerated power granted to Miami Dade County via the Home Rule Amendment. He challenges the City's decision to employ permissive state statutes to change the election dates by ordinance, asserting that this effectively violates both the City's own Charter and Article VI, section 6.03(A) of the County Home Rule Charter requiring that such a change be passed by referendum.

We take no quarrel with the City's ostensibly laudable goals. The question before us is not whether the attempted change is good policy, but rather, whether the method used to effectuate that change is constitutionally permissible. In other words – may the City enact an ordinance which

---

[6] We decline to address arguments advanced by the City for the first time in its reply brief or at oral argument. See Raffay v. Longwood House Condo. Ass'n, Inc., 389 So. 3d 589, 593 (Fla. 3d DCA 2023) ("Issues raised for the first time in the reply brief are precluded from our consideration."); State v. City of Weston, 316 So. 3d 398, 408 (Fla. 1st DCA 2021) ("Issues not raised in the initial brief are considered waived or abandoned." (quoting Rosier v. State, 276 So. 3d 403, 406 (Fla. 1st DCA 2019))).

effectively amends its Charter without submission of the issue to the will and vote of its constituents?

### A. Does the City's Ordinance make an end-run around its own Charter?

We first address the City's contention that the Ordinance does not "amend" or "repeal" the City Charter.

The City concedes the Ordinance[7] conflicts with sections 4(b) and 7 of its Charter requiring its elections to take place in odd-numbered years and limiting terms of its elected officials to two four-year terms, but in the same breath, asserts the Ordinance is not an amendment to the Charter.[8] As William Shakespeare once wrote, "What's in a name? That which we call a rose by any other name would smell as sweet."[9] While the City characterizes the Ordinance as a mere amendment to its Code of Ordinances but not to its Charter, the language and effect of the enactment belie such a

---

[7] See City of Miami, Ordinance No. 14376, § 16-2 (Miami City Comm'n June 26, 2025).

[8] Despite conceding this both below and in its initial brief, the City assumed a fundamentally different position during oral argument. This the City cannot do. See Sanchez v. Miami-Dade Cnty., 286 So. 3d 191, 195 (Fla. 2019) ("A litigant seeking to overturn a lower court's judgment may not rely on one line of argument in the trial court and then pursue a different line of argument in the appellate courts.").

[9] William Shakespeare, Romeo and Juliet, act II, sc. ii, l. 43-44.

characterization.  An ordinance that changes the existing terms of a charter *is an amendment to that charter.*

For our purposes of determining whether two provisions are in "conflict," the Florida Supreme Court has applied the "impossibility of co-existence" test.  See Jordan Chapel Freewill Baptist Church v. Dade Cnty., 334 So. 2d 661, 664 (Fla. 3d DCA 1976) ("The word 'conflict' in [the Home Rule Amendment] has been construed to mean 'contradictory in the sense of legislative provisions which cannot co-exist.'  Legislative provisions are inconsistent if, in order to comply with one provision, a violation of the other is required . . . Courts are therefore concerned with whether compliance with a[n] ordinance [r]equires a violation of a state statute or renders compliance with a state statute impossible." (citing State ex rel. Dade Cnty. v. Brautigam, 224 So.2d 688 (Fla.1969))).  These two provisions self-evidently meet this test, since the election of the mayor and commissioners cannot take place *both* in November 2025 *and* November 2026.

The dates and term limits imposed by the Ordinance directly and irreconcilably conflict with those mandated by sections 4(b) and 7 of the City Charter.  It follows that, as a result of the Ordinance, the Charter provisions will no longer have any force or effect, such that the Ordinance has effectively amended or repealed them.  See Poindexter v. Greenhow, 114

U.S. 269, 331 (1885) ("Every amendment of a law or constitution revokes, alters, or adds something."); State v. Special Tax Sch. Dist. No. 5 of Dade Cnty., 144 So. 356, 360 (Fla. 1932) ("An amendment of a Constitution [or a charter] repeals or changes some provision in, or adds something to, the instrument amended.") (internal quotation mark and citation omitted).

Relabeling the Ordinance does not alter its substantive character. Just as a rose bears thorns regardless of what it is called, so too does this enactment carry binding legal implications. It is, in truth, a charter amendment dressed in lesser clothes—fragrant in title but thorned with consequence.

### B. Do the permissive general law statutes employed by the City to enact the Ordinance mandate a conflict with the City Charter and the County Home Rule Charter?

We next address whether the permissive general law statutes[10] used by the City to enact the Ordinance conflict with the governing charters.

As we have previously explained, "[l]egislative provisions are inconsistent if, in order to comply with one provision, a violation of the other is required." Jordan Chapel, 334 So. 2d at 664. It is clear that if (pursuant to the Ordinance) the election is not held until November 2026 this would

---

[10] See § 100.3605, Fla. Stat.; § 166.021, Fla. Stat.; § 101.75, Fla. Stat. The statutes relied upon by the City to justify the Ordinance, however, when read *in pari materia*, include exceptions when in conflict with an applicable charter.

13

violate the City Charter, which requires the election to be held in November 2025.

In addition, each of the three statutes purportedly authorizing the use of an ordinance contains the word "may" as opposed to "shall." See The Fla. Bar v. Trazenfeld, 833 So. 2d 734, 738 (Fla. 2002) ("The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.'"); Stein v. Darby, 134 So. 2d 232, 237 (Fla. 1961) ("[T]he pivotal auxiliary verb 'may' . . . should not be construed as 'shall' . . . ."); Boca Ctr. at Mil., LLC v. City of Boca Raton, 312 So. 3d 920, 923 (Fla. 4th DCA 2021) ("Per the 'Mandatory/Permissive Canon,' the word 'may' is commonly treated as a permissive word granting discretion." (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012))).

We fail to recognize how a permissive state statute would preempt the City's duty to follow its own governing charters and the Florida Constitution. Indeed, these are the documents to which the City itself owes its existence and to which it is constitutionally bound. See City of Miami Beach v. Fleetwood Hotel, Inc., 261 So. 2d 801, 803 (Fla. 1972) ("[T]he paramount law of a municipality is its charter, [] just as the State Constitution is the charter of the State of Florida[.]"); Bush v. Holmes, 886 So. 2d 340, 372 (Fla.

14

1st DCA 2004) (Wolf, C.J., concurring in part and dissenting in part) ("A municipal charter is the constitution of a city and effectively limits the legislative power of a city in the same manner the state constitution limits the power of the Legislature."); <u>Club on the Bay, Inc. v. City of Miami Beach</u>, 439 So. 2d 325, 327 (Fla. 3d DCA 1983) ("The rules of law that govern municipal corporations and those who deal with municipal corporations are well settled. Municipal corporations must comply with charter provisions . . . and municipal officials may only act in accordance with the duties as defined in the applicable city charter.").

The statutes relied upon by the City do not mandate a municipality to alter its existing election dates to correspond to the dates of a national or gubernatorial election. By reason of the Legislature's use of the word "may," the general law statutes and the County Home Rule Charter (by which the City is bound) can peacefully co-exist.[11] In other words, compliance with Article VI, section 6.03(A), which requires a referendum before the City is

---

[11] Because legislative enactments are presumed constitutional, it is reasonable to infer that the Legislature employed permissive language such as "may" with full awareness that several Florida counties exercise Home Rule authority. See <u>Lawnwood Med. Ctr., Inc. v. Seeger</u>, 990 So. 2d 503, 508 (Fla. 2008) ("[A] legislative enactment is presumed to be constitutional."); <u>Cilento v. State</u>, 377 So. 2d 663, 665 (Fla. 1979) ("Acts of the legislature are presumed to be constitutional.").

authorized to change election dates and extend term limits, cannot render compliance with the statutes impossible due to their permissive nature.

We emphasize that any "conflict" between the state statutes and the subject Charters is a conflict of the City's own making and is prohibited by the Florida Constitution's grant of Home Rule authority to Miami-Dade County. "[I]t is settled that the [County Home Rule] Charter and the ordinances adopted thereunder 'must be consistent with and must do no violence to the provisions of Article VIII, Section 11, Florida Constitution, pursuant to which the charter is adopted.'" Miami Shores Vill. v. Cowart, 108 So. 2d 468, 469 (Fla. 1958) (quoting Dade Cnty. v. Dade Cnty. League of Muns., 104 So. 2d 512, 516 (Fla. 1958)).

The City is duty-bound by its own Charter and the County Home Rule Charter to make such a change by the "exclusive" method of a voter referendum, yet is choosing instead to rely on discretionary state law to cancel an election and extend term limits by way of an ordinance passed by the City Commission—actions that violate both. The City was under no obligation to utilize these statutes, but it is unquestionably obligated to abide by its own Constitution and by the constitutional authority expressly granted under the County Home Rule Charter.

16

### C. Does the Florida Constitution render the Ordinance unconstitutional as violative of the County Home Rule Charter?

Given the City's concession that the Ordinance is in direct conflict with its Charter and the County Home Rule Charter, we address whether the general law statutes relied upon by the City to enact the Ordinance supersede the referendum requirement in Article VI, section 6.03(A) of the County Home Rule Charter for amending municipal charters.

As we do in every case of constitutional interpretation, we follow principles parallel to those of statutory interpretation. See Coastal Fla. Police Benevolent Ass'n v. Williams, 838 So. 2d 543, 548 (Fla. 2003) ("The rules which govern the construction of statutes are generally applicable to the construction of constitutional provisions."). Florida law is well settled that "any inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provision's explicit language." Zingale v. Powell, 885 So. 2d 277, 282 (Fla. 2004). "Our approach to interpreting the constitution reflects a commitment to the supremacy-of-text principle, recognizing that the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Planned Parenthood of Sw. & Cent. Fla. v. State, 384 So. 3d 67, 77 (Fla. 2024) (internal quotation marks and citation omitted). "The goal of this approach is to ascertain the original, public meaning of a constitutional provision—in

17

other words, the meaning as understood by its ratifiers at the time of its adoption." Id. "In construing the meaning of a constitutional provision, we do not seek the original intent of the voters or the framers." Id. "Instead, we ask how the public would have understood the meaning of the text in its full context when the voters ratified it." Id. "Moreover, in construing multiple constitutional provisions addressing a similar subject, the provisions must be read in pari materia to ensure a consistent and logical meaning that gives effect to each provision." Zingale, 885 So. 2d at 283 (internal quotation marks and citation omitted).

"[T]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Conage v. U.S., 346 So. 3d 594, 598 (Fla. 2022) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)); see also Gray, 89 So. 2d at 789 ("[T]he applicable provisions of the Constitution and the statutes must be construed as a whole; they should not be construed in isolation. This is nothing new in constitutional interpretation. We are often put to the necessity of interpreting both constitutional and statutory provisions with an eye to their relation to other provisions.").

With these principles in mind, we turn first to the relevant provisions of the Home Rule Amendment—namely, Article VIII, section 11, subsections (1), (5), (6) and (9) of the 1885 Florida Constitution.

Subsection (1), as described above, provides Miami-Dade County with express grants of power relating to Home Rule in local affairs, including the expressly enumerated power in subsection (1)(g) granting Miami-Dade County the power to fix the method for municipalities within Miami-Dade County to amend their own charters. See Art. VIII, § 11(1)(g), Fla. Const. (1885). The plain text of this subsection commands that the method adopted by the County Home Rule Charter is "exclusive" and the Legislature "shall have no power" to amend or repeal the municipal charter. Id.

The remaining subsections contain limitations on Miami-Dade County's Home Rule authority. See Chase v. Cowart, 102 So. 2d 147, 152 (Fla. 1958) (recognizing that subsections (5), (6) and (9) contain limitations on the home rule power). Subsections (5) and (6) relate to the Legislature's authority to enact general laws[12] applicable to Miami-Dade County:

---

[12] "A general law operates universally throughout the state, or uniformly upon subjects as they may exist throughout the state, or uniformly within permissible classifications by population of counties or otherwise, or is a law relating to a state function or instrumentality." Fla. Dep't of Bus. & Pro. Regul. v. Gulfstream Park Racing Ass'n, Inc., 967 So. 2d 802, 807 (Fla. 2007) (quoting State ex rel. Landis v. Harris, 163 So. 237, 240 (Fla.1934)). By contrast, "[a] special law is one relating to, or designed to operate upon,

19

(5)  Nothing in this section shall limit or restrict the power of the Legislature to enact general laws which shall relate to Dade County and any other one or more counties in the state of Florida or to any municipality in Dade County and any other one or more municipalities of the State of Florida, and the home rule charter provided for herein shall not conflict with any provision of this Constitution nor of any applicable general laws now applying to Dade County and any other one or more counties of the State of Florida except as expressly authorized in this section nor shall any ordinance enacted in pursuance to said home rule charter conflict with this Constitution or any such applicable general law except as expressly authorized herein, nor shall the charter of any municipality in Dade County conflict with this Constitution or any such applicable general law except as expressly authorized herein, provided however that said charter and said ordinances enacted in pursuance thereof may conflict with, modify or nullify any existing local, special or general law applicable only to Dade County.

(6)  Nothing in this section shall be construed to limit or restrict the power of the Legislature to enact general laws which shall relate to Dade County and any other one or more counties of the state of Florida or to any municipality in Dade County and any other one or more municipalities of the State of Florida relating to county or municipal affairs and all such general laws shall apply to Dade County and to all municipalities therein to the same extent as if this section had not been adopted and such general laws

---

particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal; a local law is one relating to, or designed to operate only in, a specifically indicated part of the state, or one that purports to operate within classified territory when classification is not permissible or the classification adopted is illegal." Id.

20

shall supersede any part or portion of the home rule charter provided for herein in conflict therewith and shall supersede any provision of any ordinance enacted pursuant to said charter and in conflict therewith, and shall supersede any provision of any charter of any municipality in Dade County in conflict therewith.

Art. VIII, §§ 11(5)-(6), Fla. Const. (1885).

Subsection (9) provides a declaration of intent as to how the Home Rule Amendment ought to be construed:

> (9)     **It is declared to be the intent of the Legislature and of the electors of the State of Florida to provide by this section home rule for the people of Dade County in local affairs and this section shall be liberally construed to carry out such purpose**, and it is further declared to be the intent of the Legislature and of the electors of the State of Florida **that the provisions of this Constitution and general laws which shall relate to Dade County and any other one or more counties of the State of Florida** or to any municipality in Dade County and any other one or more municipalities of the State of Florida enacted pursuant thereto by the Legislature **shall be the supreme law in Dade County, Florida, except as expressly provided herein** and this section shall be strictly construed to maintain such supremacy of this Constitution and of the Legislature in the enactment of general laws pursuant to this Constitution.

Art. VIII, § 11(9), Fla. Const. (1885) (emphasis added).

By a plain reading, the relevant provisions of the Home Rule Amendment not only provide meaning to the ten express grants of authority

21

listed in subsection (1), but also emphasize that in all other contexts, general law reigns supreme. Notwithstanding, the City invites us to read subsection (6) in isolation and determine that it *alone* compels the conclusion that state general laws always supersede Miami-Dade County's Home Rule powers. We decline this invitation for two reasons. First, nearly seventy years of binding Florida Supreme Court precedent tells us otherwise. Second, to do so would require us to vitiate the elegant negotiation of limited assignment of powers effectuated between the people of Miami-Dade County and the State in adopting Home Rule, rendering the entire constitutional amendment and the County Home Rule Charter adopted thereunder meaningless.[13]

In a long line of cases dating back to 1956, this Court and the Florida Supreme Court have repeatedly held that whenever one of the specific and enumerated constitutional grants of authority in the County Home Rule Charter and a state general law come into conflict, the County Home Rule Charter controls. See Gray, 89 So. 2d at 791; Dade Cnty. v. Young Democratic Club of Dade Cnty., 104 So. 2d 636, 638 (Fla. 1958) ("[I]n the

---

[13] See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("Surplusage Canon[:] If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.") (footnote omitted).

exercise of legislative power granted by the Charter, the electors of Dade County were prohibited from infringing on the supremacy of the Florida Constitution and the general laws of Florida 'except as expressly authorized' by specific grants of power given them by Section 11, Article VIII of the Constitution, relating to home rule in local affairs for Dade County."); Metro. Dade Cnty., 396 So. 2d at 146 ("Th[e Home Rule Amendment] gives Dade County numerous powers which set Dade apart from the state's other counties.  One such difference is Dade County's power to enact ordinances, when expressly authorized by the home rule amendment, which conflict with the state constitution or with state law."); City of Sweetwater v. Dade Cnty., 343 So. 2d 953, 954 (Fla. 3d DCA 1977) ("The matter of changing boundaries of municipalities is one of the areas of autonomy conferred on Dade County by the Home Rule Amendment, with the result that the method provided therefor[e] by the Home Rule Charter, pursuant to authorization by to Home Rule Amendment, is effective and exclusive, notwithstanding the existence from time to time of a general state law which makes provision for some other method."); Bd. of Cnty. Comm'rs of Dade Cnty. v. Wilson, 386 So. 2d 556, 560 (Fla. 1980) ("[T]he provisions of the Home Rule Charter and the ordinances adopted pursuant thereto must be in accordance with general law unless there is express constitutional authorization otherwise.");

<u>Seminole Rock Prods., Inc. v. Town of Medley</u>, 180 So. 2d 457, 460 (Fla. 1965) ("We see no express authorization in [the Home Rule Amendment] that could be taken as immunizing the home rule charter, ordinances enacted in pursuance thereof, or charters of Dade County municipalities from the operation of the constitution or of general law. Rather, we see only a general authorization to provide for the establishment of municipalities which would be subject to the constitution and valid general laws then in existence or thereafter passed . . . the provisions of the constitution or of general law apply unless there is express authorization to the contrary in one of the specific grants of subsection (1) of the home rule amendment.").

We must give faithful application to this long-standing precedent recognizing the unique Home Rule authority granted to Miami-Dade County in the Florida Constitution on certain limited and enumerated powers, including the power to provide the "exclusive" method by which municipalities may amend their charters. See <u>Ramcharitar v. Derosins</u>, 35 So. 3d 94, 98 (Fla. 3d DCA 2010) ("It is axiomatic that stare decisis obligates this court to follow Florida Supreme Court precedent.").

The City's isolated reading of subsection (6) renders the Miami-Dade County Home Rule powers superfluous and nullifies the intent and purpose of the Home Rule Amendment expressly set forth by subsections (1), (5) and

24

(9). It would defy logic to establish a Home Rule Amendment that indisputably provides enumerated powers which "set Dade apart from the state's other counties" only to allow a general law of the State to supersede it, even on purely local affairs specifically identified in subsection (1). Metro. Dade Cnty., 396 So. 2d at 146. Such an interpretation would create an exception that swallows the [home] rule. See Miami Shores Vill., 108 So. 2d at 471 ("[W]e must assume that every sentence of a constitution is designed to have some effect."); Metro. Dade Cnty., 396 So. 2d at 146 ("The main purpose in construing constitutional provisions is to ascertain the intent of the framers and to effectuate the object designed to be accomplished."); Askew v. Game & Fresh Water Fish Comm'n, 336 So. 2d 556, 560 (Fla. 1976) ("In construing the Constitution every section should be considered so that the Constitution will be given effect as a harmonious whole. A construction which would leave without effect any part of the Constitution should be rejected.").

Instead, the well-established law, rules of construction and logic require us to consider the Home Rule Amendment as a whole, read its various subsections *in pari materia* and give meaning to each. It is abundantly clear that when read in context, "[these provisions] show conclusively that the legislature intended to preserve the effect of existing

25

general laws and its lawmaking power in relation to Dade County, **except as to those matters expressly authorized in the [Home Rule Amendment]**." Gray, 89 So. 2d at 791 (emphasis added).[14]  In Gray and its progeny, the Florida Supreme Court not only offered an alternative way[15] to reconcile the Home Rule Amendment's provisions; it provided the *only* way a court bound by such precedent can interpret these provisions.  See Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-13 (1994) ("It is [the Florida Supreme] Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.  A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.") (footnote omitted).

The City's chosen method to effectuate a change of its elections substantively alters the City's own Charter in a manner that conflicts with the "exclusive" method provided for in the County Home Rule Charter for amending municipal charters, which has been preempted to Miami-Dade

---

[14]  See also Wilson, 386 So. 2d at 560; Young Democratic Club, 104 So. 2d at 638; Metro. Dade Cnty., 396 So. 2d at 146; Seminole Rock Products, 180 So. 2d at 460; City of Sweetwater, 343 So. 2d at 954.  While the City would have us believe this is a novel interpretation of the Home Rule Amendment, these cases show otherwise.

[15]  The City asserts that its reading is "the only way to reconcile subsection (1) with subsection (6)."

County by way of the express grants of power in the Florida Constitution. Pursuant to the relevant provisions of the Home Rule Amendment and binding Florida Supreme Court precedent, we find the general law statutes relied upon by the City to enact the Ordinance do not supersede the "exclusive" method of amending municipal charters prescribed by Article VI, section 6.03(A) of the County Home Rule Charter.

## IV.

We answer the previously raised question in the negative and hold the City may not enact an ordinance which effectively amends its Charter without submission of the issue to the will and vote of its constituents by referendum, as required by both the City and the Miami-Dade County Charters. Therefore, as the trial court properly declared, the Ordinance is unconstitutional.[16]

This opinion shall issue forthwith and be effective immediately notwithstanding the filing of any post-disposition motion.

Affirmed.

---

[16] To the extent the order under review included findings as to the constitutionality of the three general law statutes, this opinion should not be construed as affirming such findings. Because Gonzalez did not challenge the constitutionality of the statutes either below or on appeal, we do not reach that issue.

27